## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MARIE L. BRISTOL, | ) | CASE NO. 4:07CV3055 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under Title II and Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 401, *et.seq.*, and §1381, *et. seq.* The Court has carefully considered the record and the parties' briefs. (Filing Nos. 12, 15).

## PROCEDURAL BACKGROUND

The Plaintiff, Marie L. Bristol, filed her initial application for disability benefits on August 20, 2002. (Tr. 45-47, 432-34). The claims were denied initially and on reconsideration on January 29, 2003 and May 31, 2003, respectively. (Tr. 19, 441). An administrative hearing was held before an Administrative Law Judge ("ALJ") on October 20, 2004. (Tr. 677-90). On February 18, 2005, the ALJ issued a decision finding that Bristol was not "disabled" within the meaning of the Act and therefore is not eligible for disability benefits. (Tr. 445-46). On September 23, 2005, the Appeals Council approved Bristol's request for review and remanded the case for further proceedings. (Tr. 467-70). Additionally, during the appeal process, Bristol filed an additional application for benefits in April 2005, which was accelerated to be heard by the ALJ along with the remanded 2002 application. (Tr. 672).

On February 15, 2006, Administrative Law Judge Jan E. Dutton held a new hearing on the case. (Tr. 691-725). The ALJ issued a decision finding Plaintiff "not disabled" on May 09, 2006. (Tr. 16-31). On December 28, 2006, the Appeals Council denied plaintiff's request for review. (Tr. 11-13). Because the request for review was denied, Bristol now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1).

## QUESTIONS PRESENTED ON REVIEW

Bristol argues that the ALJ's decision was incorrect because the ALJ erred in: 1) failing to set out inconsistencies in the record supporting the ALJ's opinion that Bristol is not credible; 2) finding that Bristol's daily activities are not significantly restricted; 3) finding that the opinion of Bristol's treating physician, Dr. Jason Bespalec, M.D., is not supported by the record; and 4) not giving controlling weight to the opinion of Dr. Bespalec.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Bristol is currently thirty-one years old. (Tr. 45). She earned a general equivalency diploma (GED) and completed vocational training. (Tr. 234-35). Bristol's most recent occupational experience includes working as a nursing assistant in a nursing home or private residence. (Tr. 68). Bristol initially reported her onset date as July 15, 1999, but amended this date to July 01, 2001. (Tr. 45, 20, 694). Since then, Bristol has not engaged in any substantial gainful employment. (Tr. 20, 694).

2

### Bristol's Testimony

At the hearings, Bristol testified to her educational background, which includes earning a GED.  (Tr. 679, 697).  In 1996, Bristol worked at a restaurant.  Between 1997 and 1998, she worked at a retail store, was discharged from U.S. Army basic training, worked at a gas station, and packed clothing in a factory.  In 1999, she began work in a restaurant for approximately half a year.  According to a doctor's report in October 1999, Bristol reported "[taking] care of her great-grandmother and [working] 40 hours a week[,] in addition to being a full-time mom and homemaker." (Tr. 119).  In 2000, she was employed as a babysitter for approximately seven months.  Between September 2000 and April 2002, Bristol did not appear to be employed.  In April 2002, she took a three-month job at a gas station, then worked as a care giver from August 2002.  (Tr. 68).  Bristol said that she was in training to be a nurses' aide in April 2004 during a follow-up visit to her primary physician.  (Tr. 373).

Bristol testified that she has not worked gainfully since July 01, 2001.  She attributed her difficulties to bipolar disorder, anxiety, paranoia, insomnia, hypomania (hyperactivity), migraine, fibromyalgia, and pain in her back and legs.  (Tr. 682-84, 688, 705).  Bristol testified to having problems with concentration and focus in all tasks, including relating to people.  She also has a hard time making friends, and feels anxious in crowds. (Tr. 713-15).  She takes a considerable number of medications.  Bristol noted that her pain patch and Klonopin medication cause drowsiness, making it hard for her to concentrate. (Tr. 713).

Bristol testified that she cannot stay on her feet for long periods of time.  (Tr. 702).  She has to sit down frequently and take breaks.  She loses her balance on ladders,

3

becomes ill often, and cannot lift heavy objects.  (Tr. 703-04).  She stated that her back and knees ache when she is on her feet for long periods of time.  (Tr. 702).  However, she is able to drive herself to and from work.  (Tr. 704).

Bristol testified that she looks for work in the newspaper to find desk jobs.  While she can type, she does not possess computer skills, such as the ability to use the internet.  (Tr. 707).  She has not sought vocational rehabilitation or assistance in locating a job.  (Tr. 703).

Bristol testified that she lives in a house with her boyfriend and two children, aged ten and eleven, as of the second ALJ hearing on February 15, 2006.  (Tr. 698).  Her daily routine involves getting her children ready for school and doing chores around the house, such as: picking things up, vacuuming, letting the dog out, and folding laundry.  (Tr. 707).  She testified that she spends about thirty minutes standing at the sink, twenty minutes folding clothes, and an hour walking around.

She can walk about four blocks, does not spend any time in a straight back chair between 8 in the morning and 5 in the afternoon, and she needs to change positions frequently while sitting.  The rest of the time, she is reclined on the bed or couch; including sleeping once or twice a week for around two hours at a time.  (Tr. 711, 713).  Bristol reads frequently and buys "a lot of books."  (Tr. 707-08).  Bristol visits her grandmother, runs errands, and exercises.  She prepares meals, helps her children with homework, and gets them ready for bed.  (Tr. 708).  During the summer, she plays basketball a couple times a week.  (Tr. 715).

Bristol has been treated at Family Health Services in Geneva, Nebraska, and has seen Dr. Jason Bespalec, her primary care physician on an intermittent basis since 1998.

4

(Tr. 22).  She agreed that while surgery was not required for her back, physical therapy and pain patches brought her lower back pain down to a tolerable level.  (Tr. 704).

### Vocational Expert's Testimony

Testimony was heard from a vocational expert ("VE"), Sandra Trudeau, under contract with the Social Security Administration ("SSA").  (Tr. 718).  The VE testified to two types of work, light unskilled work and sedentary unskilled work.  With the light unskilled work criteria, the VE testified that an individual of Bristol's age, education and experience who could lift or carry 20 pounds occasionally, ten pounds frequently; walk or sit for six hours in an eight-hour day, and could occasionally do postural activities, would be able to perform Plaintiff's past work as a cashier, while other jobs were precluded due to strength and specific vocational preparation requirements.  At the time of the hearing, approximately 9,000 cashier positions existed in the regional economy, and 853,000 cashier positions existed in the national economy.  (Tr. 719-20).

For sedentary unskilled work, the VE testified that if Bristol could stand or walk for two hours in an eight hour day, could sit for six hours in an eight hour day, and should not lift or carry over ten pounds on an occasional or frequent basis, she would still be able to perform sedentary work.  (Tr. 720).  Sedentary cashier jobs totaled 3,500 regionally and 140,000 nationally.  (Tr. 721).

### Documentary Evidence Before the ALJ

In addition to oral testimony, the ALJ considered medical evidence.  The evidence shows that Bristol sought medical treatment prior to her alleged onset date of July 01, 2001.

5

On October 1, 1999, Bristol saw Robert Valente, M.D., for multiple joint pain. Clinical findings included tenderness at "every one of the muscle attachment sites associated with fibromyalgia." There was also "mild" patellofemoral crepitus on the left with x-ray evidence of "mild" medial joint space narrowing. (Tr. 119). There was also atrophy, indicating that she favored that side when walking, although her gait was normal at the time of the examination. Otherwise, there was no clubbing, edema or cyanosis of the extremities, and she had "excellent" range of motion of her spine. Dr. Valente associated her chronic pain syndrome with fibromyalgia. Bristol also described what appeared to be classic migraine headaches. Bristol was placed on Celebrex and Amitriptyline, and was to follow-up in six months. (Tr. 119-120). She attended physical therapy sessions two times during the month of October, then skipped the third session; there is no evidence that she attended any further physical therapy sessions. (Tr. 117-118).

By the second physical therapy session on October 13, 1999, Bristol reported that she was "doing considerably better," stating that she was able to "stand at the counter and do dishes and other activities now that she wasn't able to do initially." (Tr. 117). However, when seen again by Dr. Valente in March 2000, Bristol was hurting more than ever, and experiencing depression. Dr. Valente attributed Bristol's recurrent symptoms to the fact that she was not getting sufficient sleep, continued to smoke cigarettes, was walking less than once a week, and failed to do her exercises on a regular basis. He reported that Bristol had not been able to "maintain her end of the bargain in managing [her] chronic pain." (Tr. 112).

At the request of Jason Bespalec, M.D., her family physician, Bristol had a mental status examination at the Blue Valley Mental Health Center on April 6, 2001, the same

6

month she alleged disability.  (Tr. 143-148).  Bristol was described as a well-groomed, very articulate, and intelligent individual.  She described a two-week history of depression and detailed depressive symptoms including compulsive eating and feelings of hopelessness "all the time."  (Tr. 144).  Bristol was diagnosed with depression, rule-out obsessive compulsive disorder, and rule-out manic depression.  (Tr. 146).  She was "of little risk on the SAD PERSONS scale" for suicide, and had a global assessment of functioning (GAF) rating of 60.[1]  She was referred to a program of weekly/bi-weekly therapy based on her depression.  Bristol attended five counseling sessions, but was subsequently discharged from the program because she did not follow through with her treatment.  (Tr. 148, 520-523).

On December 5, 2001, Bristol was admitted to Mary Lanning Memorial Hospital in Hastings, Nebraska, due to depression and suicidal ideation.  (Tr. 188).  A mental status examination by David Cockson, LCSW, showed that Bristol was able to maintain moderately good eye contact, was oriented to person, place, and date ("three spheres"); and did not exhibit flight of ideas, abnormal psychomotor movements, problems with her speech, or hallucinations.  Her physical impairments were "pretty well controlled."  (Tr. 188).  She was prescribed Lithium and Zoloft medications, and at the time of her discharge on December 9, 2001, her condition had improved.  (Tr. 187).  She was no longer expressing suicidal ideation, was noted to have a spontaneous smile, and socialized with

---

[1]A global assessment of functioning (GAF) score of 60 represents "[m]oderate symptoms or moderate impairment of social, occupational or school functioning," while a GAF of 61-70 is indicative of "some mild symptoms."

others.  (Tr. 187).  She was diagnosed with bipolar disorder and personality disorder (NOS)[2] with borderline features.  (Tr. 187-192).

After her discharge, Bristol was to continue treatment on an outpatient basis, and was referred to Glen Palmer, Ph.D., who conducted a mental status examination on January 11, 2002.  (Tr. 210).  According to Dr. Palmer, Bristol was cooperative with the evaluation procedures, her dress was casual, and her appearance was neat.  (Tr. 210).  She was oriented to the three spheres; there was no evidence of a thought disorder; she denied suicidal or homicidal ideation, her speech was normal; her attention, concentration, and working memory were intact, and her judgement and reasoning abilities appeared to be adequate.  She had a GAF of 65.  (Tr. 210).

Progress notes completed by Mr. Cockson document a majority of successful interventions and decreasing symptoms over the course of five months. (Tr. 196-209).  Bristol readmitted herself to the hospital on August 27, 2002, stating that she needed "to get (her) medications adjusted," and at the time of her admission, appeared to be overly sedated.  (Tr. 172-173).  She had been working as a care provider on the night shift from 10:00 p.m. until 7:00 a.m. (Tr. 172).  Her medications were altered and she was discharged after two days.  (Tr. 171-177).  Bristol was seen on an outpatient basis through March 31, 2003.  (Tr. 158-170).

In August 2002, a treatment note shows that Bristol fell in the shower while "preparing for work." (Tr. 290).  According to her medical records, Bristol started a new job in October 2002.  (Tr. 282).  In November 2002, she wanted a doctor's note temporarily

---

[2]Not otherwise specified.

excusing her from this position because she had "a cough and wanted to stay home from work (for) a couple of days and rest." (Tr. 278). In January 2003, she was "doing some heavy lifting" which caused some arm pain. (Tr. 275). In April 2003, Dr. Bespalec's physician assistant noted that Bristol was going on a trip to California. (Tr. 259). In June 2003, Dr. Bespalec's physician assistant advised Bristol to start a walking program to strengthen her back. (Tr. 256). Three days later, Dr. Bespalec offered therapy for her back, but she declined. (Tr. 256).

On July 3, 2003, a mental status examination performed by Pratap Pothuloori, M.D., showed Bristol to be appropriately dressed and groomed. Her thought processes, speech, memory, and concentration were relevant, coherent, and intact. (Tr. 388-89). Dr. Pothuloori stated that Bristol should continue treatment and altered her medications. (Tr. 389). She had "moderate problems" with her depressive disorder. (Tr. 388).

Since November 27, 1998, Bristol was seen on an intermittent basis by Dr. Bespalec, other physicians, and physician's assistants at Family Health Services in Geneva, Nebraska, primarily for symptoms associated with her fibromyalgia, but also for low back strain, "situational" depression, anxiety, viral infections, and headaches. (Tr. 245-357).

On August 12, 2003, Dr. Bespalec completed a "Medical Impairment Evaluation" form stating that chronic muscle pain, chronic low back pain, and chronic fatigue were responsible for Bristol's fibromyalgia. (Tr. 248). Dr. Bespalec opined that Bristol could sit for up to 6 hours and stand/walk for up to 2 hours during the course of an 8-hour work day, occasionally lift/carry up to 50 pounds, with frequent lifting/carrying up to 10 pounds. (Tr. 250). Bristol could frequently reach in all directions using both hands, perform fine hand

9

manipulations, and operate foot controls. (Tr. 250). She could occasionally use her hands for grasping/handling, but should seldom be required to bend, squat, crawl, climb, work at unprotected heights, work around moving machinery, be exposed to marked changes in temperature and humidity, drive automotive equipment, or be exposed to dust, fumes, and gases. (Tr. 250-51). Dr. Bespalec believed that Bristol should be permitted to alternate sitting and standing on an hourly basis, but for short intervals. (Tr. 251). On January 14, 2004, Bristol's gallbladder was removed due to cholelithiasis[3] with acute cholecystitis and no complications were noted. (Tr. 395-397).

Bristol continued treatment at Family Health Services with Dr. Bespalec and other providers. On April 8, 2004, she wanted something for pain because she "would like to get to work." (Tr. 374). On April 23, 2004, Bristol was seen after injuring her right hip and knee after falling while rollerblading. (Tr. 373). During a follow-up exam on April 27, 2004, Bristol stated that she was "in training to be a nurse's aide." (Tr. 373). She was to avoid "heavy work for a few days." (Tr. 373). After this, she reported pain while working on April 29, 2004, and asked for a note to excuse her from work on a Saturday in May. (Tr. 371-72).

On July 13, 2004, Bristol had a mental status examination conducted by Jose Velarde, Psy.D. (Tr. 525-26). Based on his findings, Dr. Velarde diagnosed a bipolar disorder with recent hypomania[4] and panic episodes (without agoraphobia)[5] superimposed upon cannabis abuse. (Tr. 525.) Bristol reported using marijuana two to three times per

---

[3] Production of gallstones.

[4] A mild mania especially when part of bipolar disorder.

[5] Abnormal fear of being helpless in a situation from which escape may be difficult or embarrassing that is characterized initially often by panic or anticipatory anxiety and finally by avoidance of open or public places.

month.  (Tr. 525).  Dr. Velarde felt that she was "of little risk on the SAD PERSONS scale" for suicide (attaining a score of "one" for depression), and her GAF was 60.   He recommended that Bristol continue with a nurse practitioner, Lorreen Jurgens, APRNBC, for medication management and therapy.  (Tr. 526).

On September 9, 2004, Bristol complained of "some" low back pain and "sharp, stabbing" pain in her right thigh, and stated that she had been "doing a lot of waitressing out at Mom's Café."  (Tr. 600).  Later that month, on September 22, 2004, an MRI of Bristol's lumbar spine showed only minimal disc dehydration changes at L4-L5 and a relatively small spinal canal.  There was no significant spinal stenosis[6] and no herniation. (Tr. 358).

At the referral of Dr. Bespalec, Bristol was examined by Timothy Burd, M.D., at the Nebraska Spine Center on October 20, 2004.  (Tr. 426-31).  In reference to the MRI performed on September 22, 2004, Dr. Burd stated that there was "mild" disc degeneration.   X-rays revealed 3-4 millimeters of retrolisthesis of L5 on S1, without instability or scoliosis.   Clinical findings included "minimal" pain to palpation over the thoracic and lumbar spine.  Dr. Burd opined that Bristol had multilevel lumbar spondylosis[7] with chronic lower back pain and discogenic pain syndrome, along with a nicotine dependence.  (Tr. 429).  Dr. Burd stated that "there is certainly nothing surgically that I believe will help her." (Tr. 429).  He also noted that she had "multiple nonorganic findings."

---

[6]Narrowing of the lumbar spinal column that produces pressure on the nerve roots resulting in sciatica and a condition resembling intermittent claudication and that usually occurs in middle or old age.

[7]Any of various degenerative diseases of the spine.

(Tr. 429).  Though she did "not appear to be in . . . much pain," Dr. Burd started Bristol on a course of physical therapy and counseled her to stop smoking.  (Tr. 429).

On February 17, 2005, Bristol had a lumbar epidural injection administered by Dr. Bespalec.  (Tr. 541-42).  A repeat MRI showed "mild" lumbar spondylosis and no significant disc protrusion or herniation.  (Tr. 529).  Additionally, due to complaints of dizziness and dysarthria, Bristol had an MRI of her brain on April 8, 2005.  The MRI was negative, as was other testing, including adenosinecardiolite imagining and an earlier electrocardiogram.  (Tr. 532).

On July 18, 2005, a psychiatric nurse practitioner, Lorreen Jurgens, of the Blue Valley Mental Health Center in Geneva, Nebraska, reported that she had been seeing Bristol for approximately one and one-half years for bipolar disorder with a history of cannabis abuse.  (Tr. 618).  She reported that Bristol was oriented in all three spheres, and her thought content was reality-based and goal-oriented.  Bristol had a GAF of 60.  (Tr. 618).  She also had a history of problems with substance abuse and frequently cancelled her appointments.  (Tr. 618-23).  Bristol had made sporadic progress over the past year, and had been taking more and more medications.  (Tr. 618).

At this time, Bristol indicated that she did not want to sign a release of information so that the nurse practitioner could consult with her family physician, stating that "won't be necessary, he knows what I'm taking."  (Tr. 623).  On July 22, 2005, John Jacobsen, M.D., who also treated Bristol at the Fillmore County Medical Center, stated that she was "addicted to narcotics, and that giving her more was not going to help her."  (Tr. 645).  He refilled an order for pain patches at that time, but did not prescribe further narcotics for her headaches.  (Tr. 645).

12

Due to her claim for benefits, Bristol had a consultative mental examination conducted by Michael Renner, Ph.D., on August 1, 2005.  (Tr. 624-29).  Dr. Renner diagnosed a pain disorder, bipolar disorder, and a generalized anxiety disorder.  Dr. Renner opined that Bristol had a GAF of 50.  Dr. Renner performed a similar examination and provided a separate report after initially seeing Bristol on January 28, 2000; finding that she had a pain disorder, dysthymia, generalized anxiety disorder, and a GAF of 60.  (Tr. 104-109).

On August 10, 2005, Dr. Bespalec referred Bristol to David Diamant, M.D., a Physical Medicine and Rehabilitation specialist.  Dr. Diamant's clinical findings included a normal gait pattern with no lumbar listing, scoliosis, guarding, or spasm.  Forward flexion "halfway down" and extension beyond neutral resulted in complaints of increased back pain.  Bristol was "palpably tender" throughout the entire lumbar, thoracic, and cervical paraspinal region.  Dr. Diamante's impression was diffuse axial pain, lumbar spondylosis, and a history of fibromyalgia.  (Tr. 633).  He also reviewed an MRI scan of Bristol's spine performed in February 2005.  He noted that the MRI showed mild degenerative changes which were "pretty non-specific" and stated that a physical exam was unremarkable.  (Tr. 631).  Dr. Diamant stated that he could not think of anything that "will likely lead to significant symptom improvement."  (Tr. 631).  Bristol acknowledged that she smoked a pack of cigarettes daily, and denied illicit drug use.  (Tr. 632).

Dr. Bespalec then referred Bristol to James Bobenhouse, M.D., at the Fillmore County Hospital Family Health Services, who performed a neurological examination on October 4, 2005.  (Tr. 635-36). Dr. Bobenhouse reported that Bristol had altered pinprick and light touch sensitivity in the palm of the hand bilaterally, complained of discomfort with

13

palpitation of her neck, and reported diffuse tenderness in the thoracic and lumbar paraspinal muscle regions.  (Tr. 636).  Otherwise, multiple tests were normal.  Dr. Bobenhouse recommended physical therapy for suspected tendinitis and gave Bristol splints to wear on her wrists.  (Tr. 636).

On March 27, 2006, Jeanie Zink-Wythers, LMHP, LADC, a counselor, who has a "counseling relationship" with Bristol since January 2005, reported that, in her opinion, it would be "very difficult to nearly impossible" for Bristol to "hold a job on a long-term basis" and that she is "very definitely a candidate for disability due to both her mental health and physical problems."  (Tr. 670-71).

## STATEMENT OF THE ISSUES

The issues are whether the final decision of the Commissioner is consistent with the Social Security Act, policy and regulations, and applicable case law, and whether the findings of fact are supported by substantial evidence on the record as a whole.  In particular, two areas of concern are presented.  First, whether the ALJ properly evaluated the medical findings under the "treating physician" standards, and second, whether the ALJ properly evaluated Bristol's credibility.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. §405(g) is limited to reviewing the Commissioner's decision to determine whether it is supported by substantial evidence on the record as a whole, and if so, to affirm that decision.  *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir.

14

2007); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Harris*, 45 F.3d at 1193.

"Substantial evidence is evidence that a reasonable mind would find adequate to support

the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)*; Johnson v.*

*Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001); *Holmstrom v. Massanari,* 270 F.3d 715, 720

(8th Cir. 2001).

The Court must consider evidence that both detracts from, as well as supports, the

Commissioner's decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007); *Stormo v.*

*Barnhart*, 377 F.3d 801, 805 (8th Cir. 2004); *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir.

1994). As long as substantial evidence supports the Commissioner's decision, we will not

disturb the denial of benefits so long as the ALJ's decision falls within the available "zone

of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). That decision may not

be reversed merely because substantial evidence would also support a different conclusion

or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d

860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if she is unable "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than

twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of

such severity that the claimant is "not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

**SEQUENTIAL EVALUATION**

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 404.1520. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding: 1) Bristol has not performed substantial gainful activity since July 1, 2001; 2) Bristol has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: fibromyalgia; spondylosis of the lumbar spine; migraine and vascular headaches; a bipolar disorder (possibly complicated by cannabis abuse); and a chronic pain syndrome with both physiological and psychological features; 3) Bristol's medically determinable impairments, either singly or collectively, do not meet the "listings"; 4) Bristol lacks the residual functional capacity to perform her past work as a waitress; and 5) Bristol possesses the residual functional capacity to perform light and sedentary work with the

16

ability to: lift/carry twenty pounds occasionally; lift/carry ten pounds frequently; sit, stand, and walk up to 6 hours during an 8-hour workday; bend, squat, stoop, crawl, and kneel occasionally; and frequently (but not constantly) use her hands for reaching, feeling, fingering, and handling.

**OPINION OF BRISTOL'S TREATING PHYSICIAN**

An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).  "The [social security] regulations provide that a treating physician's opinion  . . .  will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

However, "[a]lthough a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole.  *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)).  Thus, an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered an inconsistent or contrary opinion.  *Leckenby v. Astrue*, 487 F.3d 626, 633 (8th Cir. 2007); *Holmstrom,* 270 F.3d at 720; *Sampson v. Apfel*, 165 F.3d 616, 618 (8th Cir. 1999).  "The ALJ's function is to resolve conflicts among 'the various treating and examining physicians.'"  *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v.*

17

*Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985)).  Whether the ALJ grants controlling weight

to the treating physician or not, the ALJ must "always give good reasons" for that weighting.

*Holmstrom,* 270 F.3d at 720*; Prosch,* 201 F.3d at 1013 (quoting 20 C.F.R. §§

404.1527(d)(2), 416.927).

The ALJ considered the medical opinions of Dr. Bespalec, Bristol's primary treating

physician.  (Tr. 22, 23, 28).  The ALJ also considered the opinions of Dr. Valente, a

rheumatologist who saw and evaluated Johnson.  (Tr. 20-21).  The ALJ also factored in the

opinions of multiple medical consultative physicians and mental health professionals.  (Tr.

20-25).  Contrary to Bristol's argument that the ALJ incorrectly discounted Dr. Bespalec's

opinions, the ALJ gave significant weight to Dr. Bespalec's opinions.  The ALJ noted that

the Commissioner's assessment of Bristol's residual functional capacity was consistent

with both the opinions of the non-treating physicians employed by the State DDS and was

"also consistent with some" of the August 12, 2003 opinions expressed by Dr. Bespalec.

(Tr. 28).  The ALJ only discounted portions of Dr. Bespalec's opinion because they were

"inconsistent with the other substantial evidence in [the] record."  *Leckenby*, 487 F.3d at

632 (quoting *Prosch*, 201 F.3d at 1012-13).

Specifically, the ALJ noted that Dr. Bespalec appeared unaware that at the time he

submitted his assessment that Bristol had, "since her alleged onset date of disability,

worked as a nurse's aide, personal care provider and cashier," which "involved exertional

and non-exertional abilities beyond those set forth in the residual functional capacity

assessment." (Tr. 28).  The ALJ evaluated and adopted Dr. Bespalec's opinion in part, but

referred to the portions of the record which showed that Bristol's actual activities and her

work were at odds with the assessment.  *Id.*

18

Throughout the time Bristol claimed disability, she worked at multiple jobs, requiring considerable activity.  (Tr. 61, 68-74).  The medical record repeatedly shows that Bristol's care providers were aware that she was working, conflicting with their diagnosis of disability.  Notations indicate that Bristol had been working as a care provider in August 2002 on the night shift from 10:00 at night until 7:00 in the morning.  (Tr. 172).  In October 2002, Bristol started a new job, and the next month, she requested a doctor's note to excuse her from work due to a cough, and she "wanted to stay home from work a couple of days."  (Tr. 278).  This notation is significant because it shows that both Bristol and her doctor believed that she only needed to be excused from work for a few days, which is inconsistent with a disability lasting at least 12 months.  See, e.g., *Fenton v. Apfel*, 149 F.3d 907, 910 (8th Cir. 1998) (holding that a claimant has the burden to show that he has a medically determinable physical or mental impairment which will either last for at least 12 months or result in death); 42 U.S.C. § 423(d)(1)(A).

Additionally, there are no similar treatment records showing that Bristol excused herself from work due to her disability, though she reported pain due to "heavy lifting" in January 2003, and requested pain medications because "she would like to get to work" in April 2004.  (Tr. 275, 374).  Bristol was told to "avoid heavy work for a few days" in April 2004, and in September 2004, she complained of back pain and "sharp, stabbing" pain in her right thigh from "doing a lot of waitressing."  (Tr. 373, 600).  The ALJ found that "substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion," and thus she declined to adopt the entire opinion.  SSR 96-2p.

19

While the ALJ did not detail all the opinions of Dr. Bespalec, she summarized the reasons in sufficient detail to show why she was not giving Dr. Bespalec's residual functional capacity assessment controlling weight, due to the inconsistencies between the medical opinion and the treatment record.  (Tr. 27, 28).   A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions. *See, e.g., Prosch,* 201 F.3d at 1013.  We have allowed an ALJ to substitute the opinions of non-treating physicians in several instances, including where a treating physician "renders inconsistent opinions that undermine the credibility of such opinions." *Id.*[8]

Considering the record as a whole, I conclude that the ALJ evaluated Dr. Bespalec's opinions appropriately.  She weighed the evidence before her, and did not "interpret raw medical data" as Bristol states.   On the contrary, the ALJ's conclusion was based on evidence contained within the record as a whole, including Dr. Bespalec's treatment notes. Because this evidence supports the Commissioner's decision, the ALJ's decision as to the weight of Dr. Bespalec's opinion falls within her available "zone of choice," and this court will not disturb this weighing.  *See Hacker*, 459 F.3d at 936.

---

[8] It is important to note that the ALJ's RFC was partially consistent with Dr. Bespalec's assessment.  *Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) ("The ALJ did not reject Vega's opinion in toto").  Though the ALJ determined that Dr. Bespalec's medical opinions were not entitled to controlling weight with regard to the number of hours Bristol could work in a day, and the number of hours she could stand or walk, his opinions were still granted controlling weight when they did not conflict with the other substantial evidence in the case.  Specifically, Dr. Bespalec's opinions were used to Bristol's lifting/carrying, reaching, and fingering capacities.  (Tr. 30, 250).

20

## BRISTOL'S CREDIBILITY

Bristol argues that the ALJ did not properly apply the correct standard in evaluating her subjective complaints of pain.  (Filing No. 12, p. 21; *See also* 20 C.F.R. § 404.1520(e) and Social Security Ruling 96-7p).  The underlying issue is the severity of the pain.   *See Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints."  *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)).  An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'"  *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected inconsistencies that discredited the plaintiff's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

The *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1986), standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

21

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000). This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly acknowledged the factors before discounting the claimant's testimony. (Tr. 26). An ALJ is "not required to discuss methodically each *Polaski* consideration." *Id.* at 972.

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record. Ruling 96-7p provides that the ALJ must consider such factors as:

* The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

* The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) . . . . However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the

22

individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996). [9]

Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although every factor may not have been discussed).

In Bristol's case, the record illustrates that the ALJ cited the applicable statutory and regulatory authorities for the standard of review she was obliged to follow and acknowledged the rules and guidelines to be used to determine credibility.  (Tr. 25-27).  While it is true that the ALJ did not "discuss methodically each *Polaski* consideration," this is not a requirement to the finding of credibility.  *Lowe*, 226 F.3d at 972.  In making the credibility determination, the ALJ considered: Bristol's nonperformance of substantial gainful activity since July 1, 2001; discrepancies in the evidence with respect to Bristol's

---

[9]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."

work activity; Bristol's non-compliance with medical treatment and recommendations; and discrepancies between Bristol's stated limitations and the medical records.  (Tr. 27).

Contrary to Bristol's position, the ALJ did not solely state that the testimony "insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible."  (Tr. 27; Filing No. 12, p. 21).  The ALJ extensively detailed the reasons she did not find Bristol's testimony credible.  (Tr. 27).  This included, among other factors: non-compliance with psychiatric treatment (Tr. 621-22); multiple cancellations of physical therapy sessions (Tr. 613, 614); injuries sustained while rollerblading (Tr. 609); training to be a nurses' aide (Tr. 609); excessive standing during a concert (Tr. 614); and waitressing at Mom's Café (Tr. 600).  This analysis sufficiently explains the record inconsistencies supporting the ALJ's credibility determination.  Bristol's claim that the ALJ failed to properly assess must be denied.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 5th day of February, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge